# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANASTASIA SAYDLIN,  )
         **Petitioner**  )
           ) **CIVIL ACTION FILE NO.**
   **v.**  )
           )
NATHANIEL J.S. ASHBY  )
         **First Respondent**  )
           )
   **v.**  )
           )
BETTY ASHBY  )
         **Second Respondent**  )

# VERIFIED COMPLAINT AND
# PETITION FOR RETURN OF A CHILD
# PURSUANT TO THE HAGUE CONVENTION ON THE CIVIL ASPECTS
# OF INTERNATIONAL CHILD ABDUCTION AND
# THE INTERNATIONAL CHILD ABDUCTION REMEDIES ACT, CODIFIED
# AT 22 U.S.C. § 9001 *et seq.*

Petitioner, ANASTASIA SAYDLIN, respectfully shows this Court as

follows:

## I.  INTRODUCTION

1.    This action is brought by ANASTASIA SAYDLIN ("Petitioner") a

citizen of Israel, and biological Mother of her minor child to secure the return

of her daughter to Israel, A.S., born in 2018 ("Child"), under The Hague

Convention on the Civil Aspects of International Child Abduction (hereinafter

referred to as the "Hague Convention"), and who was wrongfully retained in

the United States by her Father/First Respondent, Nathanial J.S. Ashby and Betty Ashby, Second Respondent, after the child came to the United States from Israel with the Petitioner for a temporary stay.

2.      This Petition is filed pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or the "Convention") [1] and the International Child Abduction Remedies Act ("ICARA").[2] A copy of the Hague Convention is attached hereto as Exhibit "A." and a copy of ICARA is attached herein as Exhibit "B." The Hague Convention came into effect in the United States of America on July 1, 1988, and has been ratified between, and among other Contracting States, the United States of America and Israel since April 9, 1991.

3.      The objects of the Hague Convention are:

Article 1(a):  To secure the prompt return of children wrongfully removed to or retained in any Contracting State; and

Article 1(b):  To ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States *(Id).*

---

[1] Oct. 25, 1980, T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10494 (1986).

[2] 22 U.S.C. §§ 9001-9011 (previously codified at 42 U.S.C. §§ 11601 *et seq.)*

4.     The Hague Convention and ICARA authorize a federal district court to determine the merits of a claim for the wrongful removal and/or wrongful retention of a child; it does not, however, permit the district court to consider the merits of any underlying custody dispute.

5.     Petitioner filed her Hague Convention application with the Central Authority for Israel on March 14, 2022, and which Central Authority thereafter will forward it to the United States Department of State, the United States Central Authority. A copy of said Application is attached as Exhibit "C,".

6.     The minor child was born in Israel, and has resided there since birth, and continues to maintain this as her habitual residence.  A copy of the child's birth certificate is attached herein as Exhibit "D."

## II. JURISDICTION AND VENUE

7.     This Court has jurisdiction over this case pursuant to 22 U.S.C. § 9003(a) (jurisdiction under the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction).

8.     Venue is proper pursuant to 22 U.S.C. § 9003 and 28 U.S.C. § 1391(b) because, the Child and Respondents are currently staying at 651

Alexander Spring Road, Carlisle, PA 17015, within the Federal District Court for the Middle District of Pennsylvania -- Harrisburg.

### III. STATEMENT OF FACTS

7.    Petitioner and First Respondent are the parents of Child who is habitually a resident in Israel, born March 16, 2018 (hereinafter referred to as "Child."), as defined by The Hague Convention.

8.    Petitioner and the minor child reside in Haifa, Israel, in a home that the Petitioner owns.

9.    The Respondents reside together in Carlisle, PA.

10.    From November 29, 2021 until February 22, 2022, the Petitioner and child stayed with Respondents in Carlisle, PA, but did not abandon their habitual residence in Israel.

11.    Petitioner and First Respondent met in Israel, while First Respondent was in Israel participating in a study in statistics at Technion University, where he finished his Doctorate and researched the specific issue of child abuse by himself, in search of an Artificial Intelligence application to detect abuse.

12.    During the development of their romantic relationship in Israel, First Respondent emphatically declared that he did not want to have children.

4

13.    Over a two-year period the Petitioner had undertaken three unsuccessful fertility treatments with donor sperm, but was not successful, and First Respondent was aware of Petitioner's great desire for a child.

14.    However, Petitioner became pregnant, and First Respondent continued to voice his adamant stance that he did not want children and did not want to participate in raising this child.

15.    By way of example, these text exchanges occurred between the parties in August of 2017:

> 5.8.2017 14:34 Nathaniel:  No.  I told you I don't want a kid.  You want one, now you have one.
> 5.8.2017 14:35  Nathaniel:  Staying and having a kid I don't want would ruin my life.
> 5.8.2017 14:35 Nathaniel:  I don't want to pay for it, I don't want to give up my time to deal with it, I don't want to sacrifice everything I worked for something I don't want.
> 5.8.2017 14:36 Nathaniel:  We agreed if you have a kid you will deal with it and it won't be my problem
> 5.8.2017 14:36 Nathaniel:  Now you are getting mad
> 5.8.2017 14:37 Nathaniel:  When this was what we said
> 5.8.2017 14:37 Nathaniel:  I don't want to keep talking about this
> 5:8:2017 14:37 Nathaniel:  I'm not going to change my mind
> 5.8.2017, 14:38 Nathaniel:  I'm sorry you are upset but I can't ruin my life just so you feel better
> 6.8.2017 );15 -nastyasaidlin:  U don't know what is love

16.    Although Father/First Respondent was present for the child's birth in 2018,, he left after visiting her at the hospital for three minutes and did not return, despite the child having post-birth heart problems.

17.    In 2019, First Respondent visited Petitioner and the child for two weeks, and reached an agreement that Petitioner and the child would visit First Respondent in the United States, which they did in 2019.

18.    During the Petitioner and child's visit to First Respondent in 2019, Respondent confessed he wanted to marry Petitioner and asked her to forgive him and try to start working on their relationship to be a family.

19.    Following the 2019 visit to the United States, Petitioner and First Respondent continued their long-distance relationship, and when Petitioner raised concerns about the volatility of their relationship, First Respondent would attempt to quell these concerns, by enticing the Petitioner with promises of a home, United States citizenship, education and a professional position.

20.    Subsequently in 2021, Father/First Respondent appeared to want Mother/Petitioner and the child to come to the United States on a temporary basis.

21.    Despite the prior volatile relationship between Petitioner and First Respondent, the parties discussed that if Petitioner and the child came to the United States, it was for purposes of a trial period, not a relocation or change of habitual residence for the child.

22.    In fact the parties had discussions in which they agreed that Petitioner would obtain confirmation from her professional position that she could go back to work in Israel in six months.  In this regard, Father/First Respondent wrote the following:

> Mar 23, 2021 4:03:19pm
> **Nathaniel J.S. Ashby**
> For your work you should get letter saying you are on unpaid 6 month family leave.

> Mar 23, 2021 4:03:28pm
> **Nathaniel J.S. Ashby**
> So that we can show you have job to go back to

23.    In further conversations, Father/First Respondent used manipulation and threats regarding never supporting the child financially if Petitioner did not do what Father wanted.

24.    As an enticement for Petitioner and the child to come to the United States, First Respondent promised that Petitioner would have a lawyer on retainer should any issues arise, and he would financially support her home in Israel, sending money to her bank account there on a regular basis.  None of this ever occurred.

25.    In order to try to see if their relationship could work, Petitioner and First Respondent applied for and obtained a "K1" visa (Fiancée's visa) which enabled the Petitioner to come to the United States on a limited basis as long as she married the spouse within a specified period of time,

7

and immediately thereafter applied for permanent residency.  In this case, Petitioner's visa was issued by the United States Department of State on September 27, 2021.  A copy of the Visa is attached as Exhibit "E."

26.   On November 29, 2021, Petitioner and the minor child came to the United States, and began staying with both Respondents on a conditional basis.

27.   However, the Petitioner and the minor child maintained their residency and citizenship in Israel, including payments for Petitioner's maintenance of her home, mortgage and insurance, bank accounts, social security payments, and Petitioner had no intention of abandoning her habitual residence, or the habitual residence of the child in Israel.

28.   Items of personal and sentimental value remain in Israel, including household goods, and the home is rented to another individual on a temporary basis.  On various occasions, the First Respondent reminded the Petitioner not to bring much with her to the United States, and accordingly, the majority of her worldly possession remain in Israel.

29.   In addition to limited items brought from Israel, because the Petitioner would not initially have health insurance in the United States, she brought a limited supply of medication that might be needed for a cough, flu or cold.

30.    Initially, First Respondent appeared more concerned about obtaining a United States Passport for the minor child, rather than focusing on the marriage to Petitioner, and the child's United States Passport was issued on November 17, 2021 in Israel, prior to the Petitioner and child's departure from Israel.  A copy of the face page of the passport is attached as Exhibit "F."

31.    Once the child received her Social Security number, after arriving in the United States, First Respondent's relationship with Petitioner changed dramatically, into a manipulative and emotionally and physically abusive situation.

32.    Petitioner observed the First Respondent taking painkilling medication belonging to Second Respondent, and then becoming out of control, unable to stand or talk on various occasions, to which she was terrified and discussed with her friends the need to return to Israel as soon as possible.

33.    As for the marriage of the Petitioner and First Respondent, the First Respondent appeared hesitant and essentially refused to have a festive and happy occasion, and instead the parties were married by a Magistrate without any celebration and without the exchange of rings.  A copy of the Marriage License and Record is attached as Exhibit "G."

34.     Following the marriage ceremony, Petitioner inquired of First Respondent regarding the application for permanent residency, and the First Respondent appeared to be stalling the required final step which would provide Petitioner with the ability to remain in the United States.

35.     From the time of the marriage until February 22, 2022, it was apparent that both the First Respondent and Second Respondent were engaging in a planned attempt to cast the Petitioner as being unable to appropriately care for the child, despite the fact that the Petitioner had been the sole custodian of the child since birth.

36.     It was apparent to the Petitioner that First Respondent was attempting to use his knowledge of "child abuse" from his professionally related research to have the child removed from Petitioner's custody, as evidenced by his call to Children and Youth, alleging that Petitioner hit the child, while continuing to live in the same home throughout this time, and leaving the Petitioner and child alone for most of the day and evening.

37.     First Respondent co-opted his mother, Second Respondent into assisting him in having the child removed from the Petitioner, and began making unsupported allegations and assisting the First Respondent in attempting to alienate the child from her Mother who has always been the child's sole custodian.

38.    Second Respondent then began to participate in the same manipulative and emotionally abusive conduct, calling the Petitioner offensive names, photographing and taping her throughout the home, and attempting to use anything that the Petitioner did with her daughter as a reason for her to lose custody of her daughter.

39.    First Respondent and Second Respondent were verbally abusive to the Petitioner and used their rants to call the child "retarded" and used offensive words to describe the Petitioner, including "bitch," "gypsy," "cunt," "whore," "stupid," "psycho," and similar vulgarities.

40.    In the midst of these verbal rages, the First Respondent admitted to Petitioner that this relationship and marriage and trial period in the United States was "a mistake."

41.    Petitioner, around and about the middle of February, 2022 then overheard a conversation between First Respondent and Second Respondent, in which they agreed that they had to do "something fast."

42.    Thereafter, the Respondents engaged in a campaign to separate the Petitioner from the community, denying her access to people and facilities outside the home, and then taking away the Petitioner's cell phone, and denied her access to the WiFi in the home.

43.    Respondents then denied the Petitioner and the child food in the home during the day, alleging that Americans do not eat lunch.   Initially, Petitioner fought with the Respondents begging them to permit the child to have a normal lunch, but she was unsuccessful in objecting to their controlling conduct.

44.    Respondents engaged in additional tactics, telling the Petitioner that First Respondent's girlfriend would be moving into the home, and Second Respondent followed with telling the child that in nine months, she would not remember or need her mother any longer, and instructing the child not to listen to her mother any longer.  They even taught the child t call her mother names, like "mama monster," and to tell the child that "mama bit me."

45.    Second Respondent threatened the Petitioner that she would kill her, and said "O, God, take the Hebrew away from me!"; and they both said that they wished Israel never existed, and the it was lost in a war.   Both Respondents continued to use antisemitic language and identifiers for the Petitioner and the minor child.

46.    From the beginning of planning the trip to the United States, the Petitioner reiterated to the First Respondent that the Petitioner and child needed to return to Israel, as they planned if the relationship did not work out.

47.    On February 22, 2022, after being harassed, threatened, and deprived of access to anyone who could help, First Respondent took away all Petitioner's personal property, including her shoes, and threw her out of the home, without her daughter.

48.    In addition Respondents hid the child's two passports from the Petitioner and have failed to return them to the Petitioner.

49.    First Respondent and Second Respondent then proceeded to physically kick Petitioner between her legs and in her stomach, pulled her hair, physically abusing the Petitioner as they literally kicked her out of the house, while restraining the child so she could not go with her Mother the petitioner.

50.    First Respondent, in an obvious attempt to gain custody of the child as he had planned all along, filed a Protection from Abuse Petition in Cumberland County, alleging incidents for which he was not even present, the result being a temporary Order entered by the Cumberland County Court, precluding the Petitioner from any contact with her daughter, but for that agreed to by the parties, and to date, First Respondent has failed and refused to permit any contact.  A copy of the Petition for a Protection from Abuse, and the interim Order is attached as Exhibit "H."

51.    Petitioner maintains that the Child has a stable and loving life in Israel in which she was thriving, and Petitioner has and is more than capable of providing for the emotional, spiritual and mental well-being of the Child in Israel, as she has accomplished during the child's entire life.

52.    During the child's entire life, until Petitioner was physically removed from the home of First Respondent and Second Respondent, the child has never been without her mother for a day, and it is psychologically damaging for the child to be placed in this untenable situation.

53.    The Child is established in a pre-school and has been closely engaged with her extended family and community in Israel throughout her life. See a copy of a Exhibit "I".

54.    An Affidavit attested to by Nadia Misheyev, who is one of the minor child's kindergarten teachers, confirms that the child continues to have a reserved spot upon the Petitioner's return to Israel.  A copy is attached as Exhibit "J."

55.    An Affidavit attested to by Roy Ben Ami, a partner in "Precise" the company the Petitioner works for confirms that upon her return to Israel she has continued employment there.  A copy is attached as Exhibit "K".

56.    Petitioner avers that Second Respondent is conspiring with the First Respondent to wrongfully retain the child outside of Israel and is a party subject to the provisions of the Hague Convention, as well as ICARA.

57.    Respondents have wrongfully retained the Child from Israel by manipulating the Petitioner to come to the United States and then immediately undertaking a campaign to keep the child from Petitioner, and manipulating the legal system to find ways to allege abuse in an effort to keep the child in the United States.

58.    In 2020, First Respondent set up an organization and a "GoFundMe" page to raise money for his research program regarding Artificial Intelligence specifically targeted to early detection of child abuse, and it is clear that First Respondent used his research of this topic to deliberately subject the Petitioner to verbal, psychological, emotional, physical and financial abuse in an effort to obtaining custody of the child by a ruse.  A copy of First Respondent's research initiative as he described it is attached as Exhibit "L."

59.    Respondents have secreted the passports of the child  so that the Petitioner cannot return the child to Israel where Petitioner and child reside, and which is the child's habitual residence.

60.    In December of 2021, Petitioner informed First Respondent that she believed that she and the child should return to Israel, at which point First Respondent and Second Respondent took measures described herein to alienate the Petitioner from the outside world, and keep her almost as a hostage in their home.

61.    Petitioner has rights of custody of Child, as defined in the Hague Convention on the Civil Aspects of International Child Abduction, included in ICARA and under the law in Israel, where Paragraph 14 of the Legal Capacity and Guardianship Law, 2962-5722 states that the parents are the natural guardians of their children.   A copy of the English summary is attached as Exhibit "M."

62.    Petitioner was exercising her rights of custody at the time that the child was wrongfully removed from Israel and wrongfully retained in the United States, but to the contrary, First Respondent has never exercised any rights of custody of the child.

63.    Finally, because Petitioner avers that First Respondent brought her with the child to the United States on false pretenses, knowing that his sole purpose was to take custody away from Petitioner while she was visiting in the United States, Respondent has knowingly deprived the Petitioner of the right for Petitioner to lawfully remain in the United States because her

Fiancée's visa has expired without having been perfected through the Immigration system,

64.    First Respondent has willfully and knowingly advanced his attempt to wrongfully pursue custody of the child, by coercion of the Petitioner, and obtaining the child's citizenship under false pretenses advanced to achieve his dubious plan.

## IV.    WRONGFUL REMOVAL AND RETENTION OF CHILD BY RESPONDENTS:  CLAIM FOR RELIEF UNDER THE HAGUE CONVENTION AND ICARA

65.    As set forth above, on or about November 2021, First Respondent wrongfully removed the Child to the United States from Israel on a ruse to wrongfully obtain custody of the child.

66.    This matter is specifically within the jurisdiction of the Federal District Court for the Middle District of Pennsylvania, within the meaning of Article 3 of the Convention and as set forth in ICARA, and continues to wrongfully retain the Child in the Commonwealth of Pennsylvania, in the United States, in violation of Article 3, despite Petitioner's efforts to have the Child returned to Israel.

67.    Petitioner avers that First Respondent and Second Respondent have jointly and wrongfully retained the Child in the Commonwealth of

17

Pennsylvania, in United States, within the meaning of the Hague Convention and ICARA, and said Respondents are therefore subject to the sanctions as set forth in the Hague Convention and ICARA.

68.   Petitioner has never acquiesced or consented to the removal of the Child from her habitual residence in Israel to the United States or to the child's residence outside of Israel.

69.   First Respondent's removal and retention of the Child is wrongful within the meaning of Article 3 of the Convention and Second Respondent's wrongful retention of the Child in the United States from Israel because:

a) It is in violation of Petitioner's rights of custody and Guardianship as established by the law of Israel;

b) First Respondent's removal and First and Second Respondents' retention of the Child is in violation of Petitioner's right as a physical custodian to determine the Child's place of residence. See Hague Convention, Art. 5(a) (defining "rights of custody" under Article 3 to include "in particular, the right to determine the child's place of residence");

c) At the time of the Child's removal from Israel, Petitioner was exercising her rights of custody with the meaning of Articles 3 and 5 of the Convention and, but for Respondent's removal and retention of the Child, Petitioner would have continued to exercise those rights; and

18

d) The Child was habitually a resident in Israel within the meaning of Article 3 of the Convention immediately before the wrongful removal by First Respondent and wrongful retention by both Respondents.

70.    Petitioner timely filed her Application under the Hague Convention with the Central Authority for Israel  on March 14, 2022, which Central Authority will subsequently forward the Application to the United States Department of State, the Central Authority for the United States, and Respondents are presently wrongfully detaining the Child in the Commonwealth of Pennsylvania, within the jurisdiction of the District Cour for the Middle District of Pennsylvania.

71.    Upon information and belief, Respondents are wrongfully retaining the child in Carlisle, PA .

72.    The Child is three years old. The Hague Convention applies to children under sixteen (16) years of age and thus applies to this Child.

73.    The Petition is filed less than one year from First Respondent's wrongful removal of the Child. Petitioner has never consented or acquiesced to Respondent's wrongful removal or retention of the Child on a permanent basis in the United States.

## V. PROVISIONAL REMEDIES
## (22  U.S.C. § 9004 & HAGUE CONVENTION, ARTICLE 16)

74.    Petitioner requests that this Court schedule an urgent hearing on the provision of custody of the Child to Petitioner pending further Order of Court following a hearing before this Court.

75.    Petitioner requests that this Court issue an immediate order restraining anyone from removing the Child from the jurisdiction of this Court, and after a hearing, a warrant seeking immediate temporary physical custody to be granted to the Petitioner.

76.    Petitioner requests that the First Respondent and Second Respondent immediately within 24 hours of the entry of the Court's Order deposit both the child's United States and Israel passports with the Clerk of Courts for the Middle District – Harrisburg, pending further Order of Court.

77.    Petitioner also asks that this Court schedule an expedited hearing on the merits of this Petition and require that Respondents to immediately deposit all passports and visas for the Parties and the minor child with the Court to be held by the Court pending final resolution of this matter.

78.    Because the Respondents have willfully and wrongfully retained possession of the child away from Petitioner for over three weeks, without

just cause, retrain the Respondents from any unsupervised access to the child, pending resolution of this matter by the Court.

79.    Since the child's birth in 2018, this is the very first time that the child has been absent from her mother for even an overnight period, and the First Respondent and Second Respondent have refused any contact between the minor child and her mother.

## VI.ATTORNEY FEES AND COSTS
## (22 U.S.C. § 9007(b))

80.    To date, Petitioner has incurred attorneys' fees and costs in Israel and the United States as a result of the wrongful removal and wrongful retention of the Child by Respondents.

81.    Petitioner respectfully requests that this Court award her all costs and fees, including attorney fees, Marshals costs of service, transportation costs, incurred to date as required by 22 U.S.C. § 9007, as well as those subsequently incurred by the Petitioner.

82.    Petitioner shall provide the Court with a detailed list of all costs and fees, at the time of the hearing on the merits of this matter, and ask the Court to require the Respondents to pay all costs immediately upon the entry of the Court's decision to return the Child to Israel with her Mother/Petitioner..

83.    Petitioner avers that both Respondents are responsible for the payment of Attorney Fees and Costs under the Hague Convention and

ICARA, given their egregious conduct and intentional and planned interference of Petitioner's relationship with the child.

84.    Although the First Respondent is responsible for the wrongful removal and wrongful retention of the child in the United States from Israel, Second Respondent was an essential participant in the wrongful retention of the child in the United States and both should be responsible for financially compensating the Petitioner for her financial losses.

## VII.    NOTICE OF HEARING
### (22 U.S.C. § 9003(c))

85.    Pursuant to 22 U.S.C. § 9003(c), Respondents shall be given notice of these proceedings in accordance with the laws governing notice in interstate child custody proceedings.

## VIII.    RELIEF REQUESTED

WHEREFORE, Petitioner, Anastasia Saydlin, prays for the following relief:

a)    An immediate temporary restraining order prohibiting the removal of the Child from the jurisdiction of this Court pending a hearing on the merits of this Verified Complaint, and further providing that no person acting in concert or participating with Respondents shall take any action to remove the Child from the jurisdiction of this Court pending a determination on the merits of the Verified Complaint;

22

b) Entry of a temporary Order providing Petitioner with temporary custody of the child pending further Order of Court;

c) The submission by the Respondents within 24 hours of entry of an Order of Court deposit the child's United States and Israel passports with the Clerk of Courts for the Middle District – Harrisburg, pending further Order of Court.

d) The scheduling of an expedited hearing on the merits of the Verified Complaint;

e) An order that Respondents show cause at this hearing why the Child should not be returned to Israel, and why such other relief requested in the Verified Complaint should not be granted; and, pursuant to Federal Rule of Civil Procedure 65, an order that the trial of the action on the merits be advanced and consolidated with the hearing on the Verified Complaint;

f)  A final judgment in Petitioner's favor establishing that the Child shall be returned to Israel with Petitioner, where an appropriate custody determination can be made by the Court in Israel, which continues to maintain jurisdiction over the custody matter of the Child;

g) An Order requiring that Respondents pay Petitioner's expenses and costs, including transportation costs, under 22 U.S.C. § 9007, such

expenses and costs to be resolved via post-judgment motion, consistent with the procedure outlined under Local Rules of this Honorable Court; and

h) For any such further relief as may be just and appropriate under the circumstances of this case.

Respectfully submitted, this 14th day of March , 2022.

LINDA SHAY GARDNER, ESQUIRE
Attorney for Petitioner
PA ID:  78163
740 Main Street
Bethlehem, PA  18018
(610)866-9529
 lgardner@gardnerlawyers.com

## VERIFICATION

I, **ANASTASIA SAYDLIN** , verify that the statements of fact made in this document are true and correct. I understand that false statements herein are made subject to the penalties of 28 U.S. Code §1746, relating to unsworn falsification to authorities.

3|11|2022
Date

_____
**ANASTASIA SAYDLIN**